IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 2, 2011 Session

JEFFEREY D. KEY, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE
OF RANDALL EUGENE KEY ET AL.[1] v. BLOUNT MEMORIAL
HOSPITAL, INC. ET AL.

Appeal from the Circuit Court for Blount County
No. L-15795    Jon Kerry Blackwood, Judge

No. E2010-00752-COA-R3-CV- FILED - MAY 31, 2011

This is an appeal from a grant of summary judgment to the defendant hospital in a medical
malpractice wrongful death case. The trial court struck as untimely the materials filed by the
plaintiff in opposition to the defendant's motion for summary judgment. The responsive
materials were filed less than five days before the date originally scheduled for a hearing on
the defendant's motion; however the hearing was continued for several months. Having
struck the plaintiff's filings, the court held that the motion negated violation of the standard
of care and causation and granted the motion as unopposed. The plaintiff contends on
appeal that the defendant did not negate either violation of the standard of care or causation;
that the materials responsive to the motion should not have been stricken; and that, if the
materials filed in opposition to the motion are considered, the plaintiff presented issues of
material fact for trial. We vacate the trial court's grant of summary judgment and remand
for further proceedings.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Vacated; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P.
FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

---

[1]In the plaintiff's various filings, the first names of the plaintiff Mr. Key and the decedent are each
spelled in two different ways. The plaintiff Mr. Key's first name is shown both as "Jeffery" and "Jefferey."
The decedent's first name is sometimes spelled "Randal" and on other occasions it is spelled "Randall."
From our review of the whole record, we are persuaded that the correct spellings are "Jefferey" and
"Randall" and those are the ones we have used in this opinion.

John C. Duffy, Knoxville, Tennessee, for the appellants, Jefferey D. Key, individually and as administrator of the Estate of Randall Eugene Key, deceased, William Key, Betty Key, Amanda J. Key and Sondra Clark.

Diane M. Hicks, Maryville, Tennessee, for the appellee, Blount Memorial Hospital, Inc.

**OPINION**

I.

This wrongful death action was filed against Blount Memorial Hospital, Inc. ("BMHI" or "the Hospital") by Jefferey Key, individually and as the administrator of the estate of the decedent, Randall Eugene Key ("the decedent"), and others related to the decedent[2] (collectively "the Plaintiff"). The decedent presented to the Hospital on May 13, 2006, as an outpatient. He was admitted shortly after lunchtime at 12:45 p.m. Previously, from April 25 through May 12, 2006, he had been hospitalized at the University of Tennessee Medical Center ("UTMC") for complications of long-term insulin dependent diabetes. Complications from his diabetes had included amputation of a leg, four previous heart attacks, neuropathy, and end-stage renal disease requiring dialysis. He had also contracted a treatment-resistant microorganism commonly known as MRSA. He came to the Hospital by private automobile after receiving dialysis. He was to receive two units of "packed red blood cells" and go home. The reason for the order for infusion of blood was a low hemoglobin level discovered by the staff at the dialysis clinic based on testing performed at UTMC prior to the discharge of the decedent. The transfusion was never completed. The decedent's primary care physician, Dr. Serrell[3] ordered him transferred from BMHI to UTMC at 8:00 p.m. the day of his admission. He died four days later at UTMC.

---

[2]A word of clarification about the various parties is in order. There was some disagreement in the trial court about which of the named plaintiffs were proper parties. The record indicates that the opposing sides reached an agreement regarding who are the real and proper parties in this wrongful death action. Where the context permits, we will refer to the names as listed in the caption of the amended complaint collectively as "the Plaintiff." Also, Dialysis Clinic, Inc., was a defendant in the original complaint. After the Plaintiff settled with that defendant, the court allowed the Plaintiff to amend the complaint to delete the clinic as a party.

[3]Dr. Serrell's name is spelled in a variety of ways. After consulting the medical records, we believe the correct spelling is "Serrell."

A.

The core theme of the Plaintiff's case is that the nurses employed by the Hospital simply ignored an admittedly sick but otherwise functional man and allowed his condition to deteriorate to the point that he had a heart attack while waiting for a blood transfusion. The Hospital's position, as expressed in its summary judgment motion, is that the decedent's condition did not deteriorate while he was at BMHI, that his heart attack resulting in death happened after he left BMHI, and that, even if he suffered his heart attack while at BMHI, nothing the nurses did or failed to do precipitated the heart attack. Furthermore, the Hospital contends his heart condition was not treatable.

BMHI's motion for summary judgment contained a section labeled "concise statement of undisputed material facts." That section is primarily directed at explaining the decedent's condition when he presented to BMHI, his condition when he left BMHI, and the delay in giving him blood. We believe it will be helpful in solving this puzzling case if we set forth those "facts" verbatim along with the Plaintiff's response and the Plaintiff's supplemental "facts." We have taken the parties' respective "facts"[4] from the brief of the plaintiff Mr. Key because this information is set forth in his brief in a parallel format. BMHI does not contend that its "facts" as stated in Mr. Key's brief are incorrect. After we have dealt with these facts, we will discuss later whether the Plaintiff's filings will remain stricken or be considered as countervailing proof. The material as taken from Mr. Key's brief is as follows:

> 6. [Mr. Key's] blood sugar level was tested by Dialysis Clinic staff by glucometer on May 13, 2006, and it registered as being high. A blood sample was drawn . . . and was sent to BMHI Outpatient Laboratory for testing. The result of the blood glucose test was 551, a critical value. That result was called to the Dialysis Clinic staff as a critical value. The person at the Dialysis Clinic, "Stephanie," received the information and read back the results to the caller, acknowledging the critical value information.
>
> Response. Admitted for purposes of summary judgment only. As [a] counter-statement of material facts, the result of the critical value blood glucose test performed by [BMHI] Laboratory, having the correct patient name, date of birth and

---

[4]All of the "facts" listed by both sides cite supporting documents in the record. We have omitted all of those citations except those that are particularly pertinent to our analysis.

account number, was not relayed by the lab to the nurses who cared for Key later that day.

* * *

8. None of the information about Mr. Key's critical blood glucose level, his Hemoglobin level, or his complaints of weakness, nausea and vomiting that morning, were reported to BMHI staff, either verbally, or in written form.

Response. Denied. The doctor's order states a hemoglobin level of 7.9 and reports a history of blood-tinged em[e]sis. The nurse performing Key's intake spoke with Key regarding his conditions, including weakness, and she noted lethargy and sleepiness. The critical blood glucose level was in fact determined by the [BMHI] Laboratory and the Hospital was on notice of this information.

9. On arrival to the BMHI floor where Mr. Key was taken to receive the packed red blood cells, he was assessed by Nurse Anna Williams, RN. He was found to be lethargic, but oriented, and weak and sleepy. Mr. Key's blood pressure was 93/53 at 1:00 p.m.

Response. Admitted but denied that this is all the information noted by Nurse Williams.

10. Due to Mr. Key's many medical [conditions] . . . it was difficult to obtain blood from Mr[.] Key's veins . . . in order for the lab to be able to p[er]form a type and cross, and other ordered blood tests. Several attempts were required by BMHI staff.

Response. It is admitted Key's veins were difficult to obtain a blood sample from. Precisely what role Key's diseases played in this is uncertain.

11. Prior to the blood [being] started, Mr. Key developed a fever, and Nurse Williams called his doctor, Dr. Serrell, to obtain an Order to transfuse the blood, in the presence of fever.

-4-

Several attempts were made to speak with Dr. Serrell, before Dr. Serrell returned the calls.

Response. Admitted, except denied that the nurse made several attempts to page Dr. S[e]rrell, as such attempts were not separately charted.

12. Orders were received from Dr. Serrell to give Tylenol, to give the blood, to do blood cultures, and to test for a Vancomycin level. The blood had to be stopped several times, in order to obtain blood to do the blood cultures and test the Vancomycin level, as ordered by Dr. Serrell.

Response. The first sentence concerning orders from Dr. S[e]rrell is admitted. The second sentence is denied in that the blood samples for the lab to do cultures and test a vancomycin level could and should have been done prior to the beginning of the transfusion. Dr. S[e]rrell's orders were given at 5:10 p.m. Nurse Williams obtained blood from the lab at 5:29 p.m. and started the transfusion at 6:20 p.m. There is no explanation offered for why a blood sample ordered at 5:10 p.m. was not taken during the hour and ten minutes prior to the nurse starting the transfusion.

13. Mr. Key remained lethargic, and Dr. Serrell was again paged several times, before he returned the calls. Dr. Serrell was paged at 6:25 p.m., at 6:55 p.m., at 7:00 p.m., and 7:30 p.m. He returned the page at 8:00 p.m., and was given an update with regard to Mr. Key's status, the fact that he remained lethargic, that his blood pressure remained low, as well as that his temperature had decreased to 99.3.

Response. [The Plaintiff] [d]en[ies] Mr. Key merely "remained lethargic." Nurse Williams charted that he was "more lethargic and confused now, unable to keep him awake." Moreover, Key's condition was crashing. The failure of BMHI nursing staff to observe the deterioration of Randall's condition and failure to communicate this to Dr. S[e]rrell deprived Randall of critically necessary medical care. The nurse failed to follow acceptable profession[al] standards of nursing care with respect

-5-

to the monitoring, assessment, charting of her patient's condition, and failing to communicate to the doctor the deterioration in his condition. It is admitted Dr. S[e]rrell was paged several times before he returned the call. It is admitted Nurse Williams claims to have related the stated information to the doctor, but denied that she properly communicated critical information about the patient to Dr. S[e]rrell. It is denied the "update with regard to Mr. Key's status" accurately relayed the deterioration of Key's condition. There was a continual deterioration of Key's condition. The patient would have died if not transferred. Key was chronically ill before admission to BMHI; he was acutely ill at BMHI. Nurse Williams failed to comprehend that her patient urgently needed a doctor's care before his condition became irreversible.

\* \* \*

15. Mr. Key was monitored by Rural Metro Ambulance in transit from BMHI to [UTMC]. His Glasgow Coma Scale was assessed as being 11, and his blood pressure was found to be 80/60 en route to [UTMC], and 96/47 at 9:20 p.m., at [UTMC].

Response. Admitted that Rural Metro Ambulance personnel entered this information on records. However, the EMT also noted: "patient unresponsive." The EMT noted as Key's state of consciousness "altered mental status." The EMT noted Key's skin was pale, hot, and moist, with a pulse of 94. Upon arrival at the [UTMC] Emergency Room, Key's pulse fluctuated the first hour from 96/47 to 88/50.

\* \* \*

[Plaintiff's Counter Statement]

1. According to the patient chart, no one checked on the condition of Mr. Key between 12:45 p.m. and 5:10 p.m.

2. The first unit of blood was ready to be picked up from the BMHI Lab at 2:10 p.m., but Nurse Williams did not retrieve the blood until 5:29 p.m.

3.  Nurse Williams failed to comprehend that her patient's condition was rapidly deteriorating, indeed "crashing."

4.  The failure of BMHI nursing staff to follow acceptable standards of professional practice respecting the timely implementation of the doctor's orders, failing to monitor Key, failure to detect the deterioration of his condition, and the failure to communicate this information to Key's doctor caused the suffering and ultimately the death of Randall Key which would not have occurred if BMHI staff followed acceptable standards of professional practice.  (Ward Affidavit, Paragraph 5; Ford Affidavit, Paragraphs 6, 8-9.)

5.  At the time Key's sister[, who had transported him to the Hospital,] returned to the hospital at approximately 7:00 p.m., she found her brother alone in a room with his eyes rolling up to the back of his head and burned up with fever.  Clark went straight to the nursing station directly across from Key's room and asked, "What the hell is wrong with my brother."  One of the nurses walked to the door and shouted "Oh my God," at which time 4 others rushed into the room and began hovering over Key.

6. Clark demanded that the nurse call an ambulance because she was taking him out of [BMHI] and to [UTMC]. . . .

* * *

9.  The charge nurse and other personnel violated numerous applicable standards of professional nursing care in the community in May, 2006, with respect to the monitoring, detection of Key's deteriorating condition, failure to communicate Key's deteriorating conditions to his doctor, failing to perform blood glucose tests when needed, unreasonably delaying the blood transfusion, failing to stop the blood transfusion after changes in vital signs dictated this, failure to communicate these changes to the doctor, failing to follow standards with respect to the transfusion and documentation thereof, all of which resulted in Key's condition going from comparatively stable at the time of admission to

-7-

critical by the time of transfer to [UTMC]. (Affidavit of Christy Ford.).

10. Key suffered a myocardial infarction while at [BMHI]. (Ward Affidavit, Paragraph 5.) What transpired at [BMHI], due to the inattention of the nursing personnel, led to Key's death from a myocardial infarction that led to pulmonary edema and finally to cardiopulmonary collapse, which would otherwise not have occurred had Key received proper care at [BMHI]. (*Id*.)

In addition to the "undisputed facts" listed in its motion for summary judgment, the Hospital discussed numerous affidavits and deposition excerpts attached to the motion as a basis for summary judgment. One of the affidavits was from Dr. Aaron Bussey who practices in Maryville at BMHI. He is board certified in internal medicine with a second certification in endocrinology, diabetes and metabolism. Among other things, his affidavit states,

> While at [BMHI], Mr. Key exhibited lethargy, but was otherwise asymptomatic. His blood pressure was within his usual range, and was consistent with the blood pressures documented for him, over the prior week. He did not complain of pain, and had no acute changes, other than an elevated temperature. The temperature was addressed by receiving an Order for Tylenol, and Mr. Key's elevated temperature responded fully to the Tylenol administration.

> \* \* \*

> The [UTMC] chart for May 13, 2006, reflects that, just after arrival to the Emergency Department, Mr. Key's blood pressure was 96/47, which was virtually unchanged from his blood pressure of 99/47, taken at [BMHI], prior to the commencement of the blood transfusion, on May 13 2006, and 93/53, which had been his blood pressure when he was assessed at 1:00 p.m. The [UTMC] chart further reflects that Mr. Key was alert, oriented, and conversant in the days following his transfer. Mr. Key's blood glucose levels normalized within 24 hours after he left [BMHI]. This conclusively demonstrates the absence of any irreparable harm during the time he was an outpatient at [BMHI], on May 13, 2006.

When Mr. Key was readmitted to [UTMC] on May 13, 2006, cultures were obtained from his blood and his sputum, which ultimately showed that he was infected by the resistant organism referred to as MRSA. The MRSA infection in Mr. Key's blood caused him to become septic.

*   *   *

It is my opinion, within a reasonable degree of medical probability, that Mr. Key's sepsis was a significant factor in his sudden decompensation at approximately 11:00 p.m., on May 16, 2006, and subsequent death on May 17, 2006. His death was not causally related to anything that occurred, or did not occur, while Mr. Key was an outpatient at [BMHI], on May 13, 2006.

(Paragraph numbering in original omitted.)

Another physician who supplied an affidavit in support of the Hospital's motion is Dr. Taylor C. Weatherbee. Dr. Weatherbee is a cardiologist who practices at BMHI. His affidavit states in pertinent part:

Based on my review of the records and studies relating to Mr. Key, and my professional experience, it is my opinion that the care rendered to Mr. Randall E. Key at [BMHI], on May 13, 2006, was appropriate.

Mr. Key underwent a cardiac catheterization at [UTMC], on October 16, 2005, seven (7) months prior to coming to [BMHI], on May 13, 2006 as an outpatient. Mr. Key's coronary arteries, in my opinion, would not have changed greatly during that time, from that seen in the cardiac catheterization of October 16, 2005.

Randall Key had very diffuse heart disease, with multiple areas that had 80 to 90 percent occlusion, and very small coronary arteries. With his underlying arterial stenoses, and small vessels, no stenting or coronary artery bypass procedures could be performed, as no stent would fit into the vessels that had significant stenosis, and there were no coronary arteries to

which a graft could be connected. He also had a history of four (4) previous heart attacks, with no surgical interventions.

There were no signs or symptoms that an acute myocardial infarction occurred while Randall Key was at [BMHI], or while he was being transferred from [BMHI] to the [UTMC], on May 13, 2006.

Mr. Key's elevated blood sugar, while he was at [BMHI], would not have caused a myocardial infarction.

There were also no signs of ketoacidosis while Mr. Key was at [BMHI], on May 13, 2006. His respiratory rate was not rapid.

Troponin levels were obtained on May 13, 2006, after Mr. Key was transferred back to [UTMC]. There was only a small elevation in the level on arrival to [UTMC], which could have been caused by his chronic renal disease, or the patient's underlying stenosis and heart disease.

When Mr. Key was readmitted to [UTMC] on May 13, 2006, cultures were obtained from his blood and his sputum, which ultimately showed that he was infected by the resistant organism referred to as MRSA. The MRSA infection in Mr. Key's blood caused him to become septic. The blood culture done at BMHI was negative, and did not show any growth of MRSA.

It is my opinion, within a reasonable degree of medical probability, that Mr. Key's sepsis was a significant factor in his death, and that his sudden decompensation at approximately 11:00 p.m., on May 16, 2006, and subsequent death on May 17, 2006, was not causally related to anything that occurred, or did not occur, while Mr. Key was an outpatient at [BMHI], on May 13, 2006.

Due to the patient's chronic illness, cardiac status and other comorbidities, even if Mr. Key had experienced a heart attack on or about May 13, 2006, and there was no evidence of this, there would be no medical intervention possible to improve his condition.

(Paragraph number in original omitted.)

Finally, Donna J. Boyd, MSN, APRN-BC, CNS, CCRN, supplied an affidavit. In addition to establishing her qualifications, her affidavit states,

> It is my opinion, within a reasonable degree of professional nursing probability, based on my review of documents and records, my expertise and experience in the field of nursing, and as a Professor of Nursing, my familiarity with the standard of care for Blount County, Tennessee, and in particular, BMHI, that the nurses who cared for Randall Key on May 13, 2006, while he was an outpatient at BMHI, did not fall below the applicable professional standard of nursing care.

(Paragraph numbering omitted.)

Dr. Nina H. Ward, whom the Plaintiff had disclosed by answer to interrogatories as an expert, supplied an affidavit in opposition to the motion for summary judgment. As we have stated, this affidavit was filed on September 28, 2009, and faxed to counsel for the Hospital. The substance of the affidavit is repeated below.

> 4. It is my opinion within a reasonable degree of medical certainty that [BMHI] nurses and staff fell below applicable standards of hospital care regarding timely implementation of Dr. Serrell's orders.
>
> The dialysis unit faxed Dr. Serrell's orders to [BMHI] at 8:40 am. A [BMHI] lab record reflects receipt of a blood sample at 8:31 am. Results included critical values for blood glucose, prothrombin time and INR. . . . [T]hese results were not put on Randal[l] Key's chart on admission at 12:45 pm and were never communicated by the lab to the hospital floor or to the nurse caring for the patient.
>
> Dr. Serrell's orders included a specific list of the serious medical conditions Mr. Key had which required that he be more frequently monitored than someone merely with anemia. The charge nurse admitted awareness of Mr. Key's medical conditions on intake of the patient. However, she did not chart any monitoring of Mr. Key between 12:45 pm and 5:10 pm. It

-11-

is questionable whether any monitoring occurred. Even if it did, nursing staff failed to properly assess Mr. Key or they would have become aware that he suffered a myocardial infarction while under their care and had a consistently deteriorating condition. [BMHI] nursing staff failed to properly monitor and assess Mr. Key's deteriorating medical condition resulting from an MI. Even if they had monitored him, they failed to communicate to Dr. Serrell necessary information about Mr. Key's condition that would have enabled Dr. Serrell to give appropriate orders for Mr. Key's care before his condition became irreversible.

Notwithstanding that [BMHI] received a blood sample long before Mr. Key's admission at 12:45 pm, the transfusion ordered by Dr. Serrell and faxed by the dialysis unit to [BMHI] at 8:40 am, was not even started until 6:20 pm. This leaves an unexplained delay of over five hours. . . .

\* \* \*

The only deterioration in condition reported by the charge nurse to Dr. Serrell at 5:10 pm was a slight temperature elevation. The failure of [BMHI] nursing staff to observe the deterioration of Mr. Key's condition and failure to communicate this to Dr. Serrell or his covering physician deprived Randal[l] Key of necessary critical medical care. By the time Randall arrived at [UTMC], his condition had become irreversible.

5. It is my opinion within a reasonable degree of medical certainty that the failure of [BMHI] nursing staff and others to follow acceptable standards of professional practice respecting the timely implementation of Dr. Serrell's orders, failure to monitor Mr. Key while awaiting transfusion, failure to detect the deterioration of his condition and failure to communicate this information to Dr. Serrell or his covering physician caused suffering and . . . the death of Randal[l] Key. The death of Mr. Key would not have occurred had [BMHI] nursing staff and others followed acceptable standards of professional practice.

-12-

After Mr. Key arrived at [UTMC], his troponin level at 9:22 pm was 0.58, at 2:25 am on 5/14/06 it was 6.54, at 8:55 am it was 8.45. A troponin of 8.45 is a significant elevation and indicates a heart attack. As it takes approximately six hours for troponin levels to rise following myocardial damage, Mr. Key had the heart attack while he was at [BMHI].

Mr. Key's chest X-ray at [UTMC] showed acute heart failure. The combination of low blood pressure, heart failure and elevated troponin indicated a significant heart attack that made him unable to pump blood adequately – hence his blood pressure was low and he had pulmonary edema as the fluid backed up into his lungs.

It is my opinion within a reasonable degree of medical certainty that the sub-standard care of Key and failure to communicate patient information to the doctor by [BMHI] nurses and staff caused Key's condition to become irreversible leading to his death, which would not have otherwise occurred.

While at [BMHI] Mr. Key suffered a heart attack, a myocardial infarction that led to his death at [UTMC]. It is my opinion within a reasonable degree of medical certainty that what transpired at [BMHI], due to the inattention of the nursing personnel, did lead to Mr. Key's death from a myocardial infarction that led to pulmonary edema and finally to cardiopulmonary collapse, which would otherwise not have occurred. I agree with final diagnosis of the physicians who were taking care of Randal[l] Key at [UTMC], that he had an acute myocardial infarction with subsequent cardiopulmonary collapse and death.

6. With respect to the Affidavit of [BMHI]'s physician witnesses, I point out the following: Dr. Weatherbee states that Mr. Key did not have a myocardial infarction but died of sepsis. The discharge/death summary from [UTMC] lists the discharge diagnosis to be "Acute myocardial infarction with cardiopulmonary collapse." This diagnosis is from the physicians who were taking care of this patient at [UTMC] during his admission after his transfer from [BMHI]. The chart

-13-

also indicates that a cardiology consult was obtained during Mr. Key's stay from May 13 to May 17, 2006.

The patient had a fever but little other evidence of sepsis. His blood cultures were negative at the time he was at [BMHI] and for this admission at [UTMC]. His chest X-ray indicated lower lobe pneumonia. Dr. Weatherbee indicates a "small elevation in the level" of his troponin. He must not have read the rest of the record which, in fact, documents that Mr. Key had a significant elevation of his troponin to 8.45, a level well above that which would be expected because of Key's chronic renal failure.

The affidavit of Dr. Bussey indicates, "While at [BMHI], Mr. Key exhibited lethargy but was otherwise asymptomatic." In fact, Mr. Key was confused, somnolent, febrile, hypotensive with a Glasgow Coma Scale of 11 at the time of his ambulance transport to [UTMC].

Christy Ford, R.N., who works at Baptist West Hospital in Farragut, supplied a lengthy affidavit that speaks of numerous violations of the applicable standard of care by the BMHI nurses. We will summarize them. The nurses failed to perform a "Chem strip blood glucose" test until after they had called the doctor at 5:10 p.m. The nurses "unreasonably delayed the blood transfusion order by Mr. Key's doctor." It should have begun no later than 2:30 p.m. The Hospital's explanations for the delay are unacceptable. The nurses failed to monitor, assess, chart, and communicate the patient's condition to the doctor. There is no indication in the chart that the patient was checked between 1:00 p.m. and 5:10 p.m. The chart contains suspicious entries that appear to have been made after the fact. There were numerous deficiencies in the transfusion. It was done by a nurse assistant and should have been performed only in the presence of an R.N. There were significant changes in the vital signs, including the respiratory rate, that the nurse assistant did not appreciate. Also, the patient should have been on oxygen during the transfusion.

In addition to the record materials we have identified thus far, the Plaintiff referred the court to the answers to interrogatories as record support for finding genuine issues of material fact. The Plaintiff argued they were part of the record well in advance of the hearing date and were substantially identical to the later filed affidavits of Dr. Ward and nurse Ford. The Plaintiff made the same argument in writing in the pleadings filed after the hearing on the Hospital's motion but before entry of the order granting summary judgment.

B.

As we have stated, the court struck the Plaintiff's filings in opposition to the Hospital's motion for summary judgment as untimely because they were not filed five days before October 2, 2009, the date on which the Hospital originally set the motion for hearing by unilateral notice. However, the hearing on the motion for summary judgment did not go forward on October 2; it was continued to February 19, 2010. By then, the Plaintiff's filings in opposition to the motion for summary judgment had been on file for approximately four months. The parties' filings between September 1, 2009, the date the Hospital filed its motion for summary judgment, and the entry of the order granting summary judgment on March 4, 2010, are important to the resolution of this appeal and will be delineated in some detail.

The Plaintiff filed the original complaint on May 14, 2007, after Randall Key's death on May 17, 2006. On August 18, 2009, the trial court entered an amended scheduling order setting the case for trial on October 13, 2009. The scheduling order set September 1, 2009, as the deadline for filing motions for summary judgment. The Hospital filed its motion for summary judgment on the last day allowed, and gave notice to the Plaintiff that the motion would be heard on October 2, 2009.

On September 28, 2009, four days before the noticed hearing date, the Plaintiff filed and served by facsimile the affidavit of Nina Ward, M.D., in opposition to the motion for summary judgment. The fax transmission began at exactly 5:00 p.m., but did not arrive in the office of the Hospital's counsel until shortly after 5:00, an hour at which, according to the Hospital's counsel, the office closes for business. Later that same day, the Plaintiff faxed to the Hospital's counsel the affidavit of his nurse expert, Christy Ford, R.N., in opposition to the motion for summary judgment. Both affidavits were essentially a repeat of the Plaintiff's answers to expert interrogatories filed several months before the motion for summary judgment was set for hearing. The next day, September 29, 2009, three days before the noticed hearing date, the Plaintiff filed the affidavit of the nurse expert as well as a response to the Hospital's statement of undisputed facts. On September 30, 2009, the Plaintiff also filed and served a notice of hearing on his motion to file an amended complaint, which motion to amend had been filed August 14, 2009. The notice set the hearing on October 2, the same day as the motion for summary judgment.

On the day of the hearing, the Hospital filed a motion asking, in the words of the motion's caption, that the trial court "ignore and not consider" all the pleadings filed by the Plaintiff in opposition to the motion for summary judgment and that the court "only consider Defendant's Concise Statement of Undisputed Facts." The Hospital also filed a motion to strike the affidavit of the Plaintiff's expert, Dr. Ward. The Plaintiff filed on the same day a

response to the Hospital's motion to ignore and a motion to "File Instanter" the previously-filed materials in opposition to summary judgment. Some of the pleadings filed the day of the hearing were exchanged by fax the day before the hearing. This exchange prompted counsel for the Plaintiff to offer to continue the hearing date even if that meant giving up the case's trial date.

The Hospital did not agree to the continuance. The parties appeared and argued their positions. Although the record does not contain a transcript of the hearing, the parties agree the trial court announced that it was continuing the hearing and the trial. The Hospital then made an oral motion that the court "freeze the case" as it existed on October 2, 2009. The court granted the motion in an order entered October 13, 2009, that (1) continued the trial indefinitely "until all pending Motions are heard"; (2) prohibited the filing of any additional motions "absent prior leave of Court"; (3) directed the parties to schedule hearing on all motions filed through October 2, 2009, through the judge's secretary on a day "other than Monday or Friday"; and (4) froze the case "in all regards as it existed on October 2, 2009, subject to further Order of the Court."

Judge W. Dale Young presided over the case through the date of entry of the order freezing the case. After that date the case was reassigned to senior judge, Jon Kerry Blackwood. Judge Blackwood heard argument on all pending motions on February 19, 2010. He announced from the bench that the court was granting the Plaintiff's motion to amend, granting the Hospital's motion to ignore the filings made in opposition to the motion for summary judgment, and taking the motion for summary judgment under advisement. The court specifically stated that the faxed affidavit of Nina Ward, M.D., would be stricken because it arrived after 5:00 p.m. on September 28, 2009.

The Plaintiff's counsel filed a motion for reconsideration of the order granting the motion to ignore the Plaintiff's pleadings. It was supported by the affidavit of counsel which, essentially, accepted blame for not filing the pleadings on time but offered excuses for the delay including (1) counsel's busy professional schedule during the month of September 2009, (2) the variable schedule of one of the Plaintiff's experts, an emergency room physician, which made it difficult to coordinate the preparation and signing of an affidavit, (3) the information in the affidavits of the Plaintiff's experts was substantially identical to the answers to expert interrogatories, and (4) counsel's experience that the time requirements of Tenn. R. Civ. P. 56.03 had not been strictly construed in favor of striking untimely pleadings but had routinely resulted in allowing a continuance. Counsel also stated that he had offered to continue the hearing even though that meant losing the trial date.

On March 4, 2010, the court entered an order denying the motion for reconsideration without explanation. With regard to the court's announcement from the bench that it was striking the Plaintiff's pleadings, the order offered the following explanation:

> A non moving party's failure to comply with Tenn. R. Civ. P. [56.03] may result in the trial court's failure to consider the factual contentions of the non moving party even though those facts could be ascertained from the record. The statement of material facts filed by the parties on a motion for summary judgment are not merely superfluous abstracts of the evidence. Rather they are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions. They are, in short, a roadmap, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own. *Owens v. Bristol Motor Speedway*, 77 S.W.3d 771, [774] (Tenn. Ct. App. 2001)[;] *Holland v. City of Memphis*, 125 S.W.3d 425, [428] (Tenn. Ct. App. 2003).
>
> The requirements of Rule 56.03 are mandatory and it is not the duty of the court, trial or appellate to search the record in order to find a disputed fact. *Williams v. Watson*, (2007 Tenn. LEXIS 521 Tenn. June 2007). The mandatory aspects of Tenn. R. Civ. P. 56.03 requires that the non moving party file their response and concise statement of disputed facts within the time frame prescribed by the Rule. In the case at Bar, [the P]laintiff failed to file their response within the appropriate time. Therefore, the Court Orders that [the P]laintiff's late filed response is stricken from the Record.

After setting forth the law with regard to summary judgment motions, the court stated its reason for granting summary judgment in this case.

> In reviewing [BMHI's] statement of undisputed facts and the affidavits of Drs. Bussey and Weatherbee, the Court finds that the [Hospital has] met [the] burden of production by negating essential elements of [the P]laintiff's claim. Both Doctors opine that [Mr. Key's] death was not causally related to any actions

-17-

taken by the [Hospital]. Furthermore, Dr. Weatherbee opines that the medical treatment provided to [Mr. Key] by the [Hospital] was appropriate. The affidavit of Donna J. [Boyd] establishes that the [Hospital] did not deviate from the applicable standard of care. The filings of the [Hospital] in support of [the] motion for summary judgment negates a violation of the standard of care and causation which are elements of [the P]laintiff's case. Having determined that [the P]laintiff's late filed documents should be stricken, the [P]laintiff fails in his burden. Consequently, this Court finds that summary judgment is appropriate.

## II.

The Plaintiff has appealed. The issues he raises, as rephrased by this Court, are,

> Whether the court erred in holding that the Hospital negated one or more elements of the Plaintiff's case.

> Whether the trial court erred in striking the Plaintiff's pleadings in opposition to the motion for summary judgment.

> Whether the court erred in denying the Plaintiff's motion for reconsideration.

> Whether the Plaintiff's materials filed in opposition to the motion for summary judgment establish a genuine issue of material fact.

## III.

These issues invoke two very different standards of review.

> The granting or denying of a motion for summary judgment is a matter of law, and our standard of review is de novo with no presumption of correctness. **Blair v. W. Town Mall**, 130 S.W.3d 761, 763 (Tenn. 2004). Summary judgment should be rendered "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04.

*Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010). The decision whether to strike materials filed in opposition to a motion for summary judgment as non-compliant with Tenn. R. Civ. P. 56.03 is reviewed for abuse of discretion. *Owens v. Bristol Motor Speedway, Inc.*, 77 S.W.3d 771, 774-75 (Tenn. Ct. App. 2001).

IV.

A.

We begin our discussion with the issue of whether the court erred in holding that the Hospital negated one or more elements of the Plaintiff's case. If the Hospital did not negate one or more elements of the Plaintiff's case, then the Plaintiff did not come under the burden of showing that a genuine issue of material fact exists. *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1, 7-8 (Tenn. 2008)(*citing McCarley v. West Quality Food Service*, 960 S.W. 2d 585 (Tenn 1998); *Blair v. W. Town Mall*, 130 S.W.3d 761 (Tenn. 2004)).

The Plaintiff does not argue that the affidavits submitted by the Hospital fail to negate the elements of causation and violation of the standard or care. Rather, the Plaintiff argues (1) that the Hospital's concise statement of facts should be ignored because it was a part of the motion itself and was not a separate document and (2) that the affidavits of the Hospital's experts should not be considered because they were not mentioned or cited in the Hospital's concise statement of facts. The Plaintiff acknowledges that the argument is based on a strict reading of Tenn. R. Civ. P. 56.03, but argues that, if it is fair to read the Rule strictly against him, then fairness requires that the Rule be strictly construed against the Hospital. The language pertinent to both perspectives is as follows:

> In order to assist the Court in ascertaining whether there are any material facts in dispute, any motion for summary judgment made pursuant to Rule 56 of the Tennessee Rules of Civil Procedure shall be accompanied by a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial. Each fact shall be set forth in a separate, numbered paragraph. Each fact shall be supported by a specific citation to the record.
>
> Any party opposing the motion for summary judgment must, not later than five days before the hearing, serve and file a response

to each fact set forth by the movant either (i) agreeing that the fact is undisputed, (ii) agreeing that the fact is undisputed for purposes of ruling on the motion for summary judgment only, or (iii) demonstrating that the fact is disputed. Each disputed fact must be supported by specific citation to the record. Such response shall be filed with the papers in opposition to the motion for summary judgment.

In addition, the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried. Each such disputed fact shall be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute.

If the non-moving party has asserted additional facts, the moving party shall be allowed to respond to these additional facts by filing a reply statement in the same manner and form as specified above.

Tenn. R. Civ. P. 56.03. The thrust of the Plaintiff's argument is that the court construed the rule too strictly against him, therefore it should have construed the rule too strictly against the Hospital. This is akin to arguing that, in this particular situation, two wrongs will make one right. We decline the Plaintiff's invitation into error in favor of simply trying to determine and follow the law with regard to each party.

We agree with the Plaintiff that the language of Rule 56.03 implies that the "concise statement of facts" will be made in a document that is "separate" from the motion for summary judgment. The word "accompanied" also suggests that the motion will be one document and the statement of concise facts will be another document. However, we can see no good reason for holding that a judge, in the exercise of its sound discretion, cannot consider a "concise statement of facts" simply because it is incorporated into the actual motion for summary judgment. This is especially true where, as here, the concise statement is conspicuously identified by a heading within the one document. We note that our decision here is not in any way inconsistent with our decision in *Owens v. Bristol Motor Speedway,* 77 S.W.3d 771 (Tenn. Ct. App. 2001). In *Owens* we held that the trial court acted within its discretion to disregard materials filed in opposition to a motion for summary judgment, but we also recognized that the trial court had the discretion to waive the technical requirements of the rule and consider non-compliant materials. *Id*. at 774-75. Further,

-20-

*Owens* presented a party's failure to file *any* document that specifically provided the "roadmap" needed by the court to determine whether or not there was a genuine issue of material fact. *Id*. In the present case, the Hospital identified the key facts in its motion for summary judgment.

The Plaintiff is correct that the affidavits of the Hospital's experts, which the trial court relied on in granting summary judgment, were not cited or discussed in the Hospital's concise statement of facts. This failure implicates the language in Tenn. R. Civ. P. 56.03 providing that, "Each fact [in the concise statement of undisputed facts] shall be supported by a specific citation to the record." However, as we have indicated, the affidavits of Dr. Weatherbee and Dr. Bussey were attached to the Hospital's motion and were discussed, with accompanying citations, in the motion. This is not preferred practice, but, in our view, it substantially complied with Rule 56.03 and the purposes behind the Rule. Even if the Hospital's motion did not substantially comply with Tenn. R. Civ. P. 56.03, we do not find that the trial court erred in holding that the Hospital negated the essential elements of causation and deviation from the standard of care. The court specifically stated that it read and considered the affidavits of the Hospital's experts. It was within the court's discretion to do so, even if the materials being considered did not comply with Rule 56.03. *Bristol Motor Speedway*, 77 S.W.3d at 774-75. Accordingly, we hold that the trial court did not err in finding that the Hospital had negated the elements of causation and deviation from the standard of care.

B.

We turn now to the Plaintiff's arguments that the trial court erred in striking the materials filed in opposition to the motion for summary judgment and in refusing to grant relief on reconsideration. We do not reach the second point because we hold that the trial court abused its discretion in striking the documents as untimely filed. We have quoted Rule 56.03 in its entirety above. We are concerned now with the language which requires that the "response to each fact set forth by the movant" be filed "not later than five days before the hearing." Similar language is repeated in Tenn. R. Civ. P. 56.04 which requires the adverse party to a motion for summary judgment to "serve and file opposing affidavits not later than five days before the hearing." We agree with the Plaintiff that the trial court abused its discretion because "the hearing" on the motion for summary judgment was not October 2, 2009. The order granting summary judgment on its face establishes that the hearing was held on February 19, 2010, and that the materials filed by the Plaintiff in opposition to the motion for summary judgment were all filed by September 30, 2009. By any method of counting, the Plaintiff's materials were filed more than five days before the February 2010 hearing.

The only explanation for the trial court's ruling is that it construed the term, "the hearing," to be the previously set hearing date of October 2, 2009. The record is silent as to why the court continued the October hearing, and there is no argument being made in this case that the trial court erred in continuing the hearing. It is true that the trial court "froze" the record as it existed on October 2 in its order continuing the motion for summary judgment hearing and the trial. However, we see little or no significance in that peculiar circumstance because, by October 2, 2009, the Plaintiff had filed his materials responding to the motion for summary judgment. The Hospital cannot complain of the record being frozen as it asked in an oral motion that the record be frozen.

Neither party offers any cases interpreting whether "the hearing," as used in Tenn. R. Civ. P. 56.03 and 56.04, means the actual date the motion for summary judgment is heard as opposed to a previously scheduled date that is continued. We believe the plain meaning of the language is abundantly clear that it refers to the date the motion for summary judgment is argued on the merits. *See **Eastman Chem. Co. v. Johnson***, 151 S.W.3d 503, 507 (Tenn. 2004)(When a statute is clear, courts apply the plain meaning without complicating the task.). In **Kenyon v. Handal**, 122 S.W.3d 743 (Tenn. Ct. App. 2003), we discussed at length the "timeliness of Ms. Kenyon's response to Dr. Handal's motion for summary judgment" without seeing the need to engage in statutory construction as to whether "the hearing" was the date of February 18, 2000, when the motion for summary judgment was originally scheduled for hearing, as opposed to February 25, 2000, when it was actually heard. ***Id***. at 750 (capitalization omitted). In our lengthy analysis, we remarked that "[a]fter opposing counsel agreed to reschedule the hearing for February 25, 2000, the deadline for filing Ms. Kenyon's response and opposing affidavits became February 18, 2000." ***Id***. at 752. Thus, **Kenyon** supports our holding that "the hearing" in the present case was February 19, 2010, the actual date of the argument on the merits of the motion for summary judgment. The trial court applied an incorrect legal standard in treating October 2, 2009, as the hearing date for purposes of determining the timeliness of the Plaintiff's response to the Hospital's motion for summary judgment. It is axiomatic that application of an incorrect legal standard to the detriment of a party can constitute an abuse of discretion. *See **Lee Medical, Inc. v. Beecher***, 312 S.W.3d 515, 524 (Tenn. 2010)(discussing parameters of abuse of discretion standard). We hold that the trial court's application of an incorrect legal standard which resulted in the striking of the Plaintiff's filings constituted an abuse of discretion.

C.

Finally, we must decide whether the Plaintiff's filings in opposition to the motion for summary judgment were sufficient to identify genuine issues of material fact. In making this determination, we must be cognizant of some well-established principles that govern summary judgments.

Summary judgment operates to dispose of a case only when it presents no genuine issue of material fact and when the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04. Rule 56 therefore precludes trial courts from deciding issues of material fact in ruling on a motion for summary judgment. *Mills v. CSX Transp., Inc.*, 300 S.W.3d 627, 631 (Tenn. 2009). . . . .

\* \* \*

. . . . Under well-established law, a court considering a summary judgment motion "must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Blair*, 130 S.W.3d at 768 (*quoting Byrd*, 847 S.W.2d at 210–11). Summary judgment is warranted [only] if the facts and inferences from those facts "permit a reasonable person to reach only one conclusion." *Staples[ v. CBL & Assocs., Inc.]*, 15 S.W.3d [83, 89 (Tenn. 2000)].

*Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777, 782-84 (Tenn. 2010).

The Hospital does not argue in its brief that the Plaintiff, through his "late" filings, failed to establish a genuine issue of material fact as to a deviation from the standard of care. The Hospital does present lengthy argument that even if the affidavit of Dr. Ward[5] is considered, the Plaintiff failed to establish a genuine issue of material fact as to causation. The Hospital argues that even if a jury heard testimony consistent with Dr. Ward's affidavit testimony it could not conclude that the actions or omissions of the nurses at BMHI caused Mr. Key to suffer any harm that he would not have otherwise suffered. *See Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993)(must be more likely than not that conduct of the defendant was a cause in fact of the result).

We have previously quoted from Dr. Ward's affidavit at length in this opinion. Taken on its face, it would allow a jury to conclude the following. The nurses at BMHI knew enough about Mr. Key's condition when he presented that they were required to monitor his

---

[5]The Hospital also argues that the Plaintiff's answers to interrogatories disclosing the substance of Dr. Ward's expected testimony are insufficient evidence of causation. Since the basis for even considering the answers to interrogatories in the discussion is that they are substantially identical to the affidavit, we will focus on the affidavit.

condition closely and report any changes to his doctor. Notwithstanding Mr. Key's significant problems, the nurses at BMHI simply ignored him for five hours, all the while his condition deteriorated in several respects. His blood glucose reached dangerous levels. He incurred a fever. His heart rate dropped. He experienced respiratory problems. The transfusion was not started in a timely manner. Even after the transfusion was started, it was not done properly and Mr. Key was not given the oxygen he should have received. His condition was already fragile and became worse while waiting on the transfusion. Some of his problems could have been treated if the nurses had reported them to Mr. Key's doctor in a timely fashion. Proper treatment, more likely than not, would have kept Mr. Key from sustaining another heart attack. The heart attack began while Mr. Key was at BMHI. Unless the Hospital's arguments convince us that one or more of these factual links must be ignored, we conclude that the Plaintiff, by Dr. Ward's affidavit, presented genuine issues of material fact as to causation.

One argument the Hospital makes against Dr. Ward's affidavit is that it does not refute the cardiologist's opinion that Mr. Key's heart condition was not medically treatable. In truth, it is more accurate to say that the cardiologist only demonstrated that Mr. Key's heart condition was not treatable surgically. The cardiologist gives reasons why the heart condition could not be treated surgically, but nothing other than a conclusion with regard to the broader realm of the heart condition being subject to "medical intervention." At any rate, the simple answer is that if the actions or inactions of the nurses precipitated the heart attack, Mr. Key sustained harm that he otherwise would not have sustained. It may well be that the "untreatability," assuming that is true, is part and parcel of the harm that Mr. Key sustained.

The Hospital also argues that its cardiology expert and the medical records "establish[] conclusively . . . that no heart attack occurred while [Mr. Key] was at [BMHI]." This argument does not withstand scrutiny. It is based upon the idea that the troponin level of .58 when Mr. Key arrived at UTMC at 9.22 p.m. is inconsistent with a heart attack. The record establishes that a patient's troponin level is an important marker for a heart attack. A level of .58 is only slightly elevated. However, by 2:25 a.m., less than six hours after Mr. Key arrived at UTMC, his troponin level had climbed to 6.54. Dr. Ward's testimony states that it takes "approximately six hours for troponin levels to rise following myocardial damage." Further, in addition to the rise in troponin level, Dr. Ward states in her affidavit that "Mr. Key's chest X-ray at University of Tennessee showed acute heart failure" which was also indicative that Mr. Key suffered the heart attack before he left BMHI. In short, the Plaintiff established an issue of material fact as to whether Mr. Key sustained his heart attack at BMHI before he was transferred to UTMC at the insistence of his sister.

The Hospital also makes much of Dr. Ward's concession in her deposition that the nurses would not necessarily have known that Mr. Key was having a heart attack or that the

-24-

symptoms he was experiencing were symptoms of a heart attack. The Hospital even goes so far as to argue that this concession is contradictory to the testimony in her affidavit that the actions of the nurses, or inactions, caused Mr. Key to sustain a heart attack. We are not convinced by the Hospital's argument. We agree with the Plaintiff that the limitations in the nurses' abilities, as compared to the familiarity and expertise of Mr. Key's doctor who ultimately ordered him transferred to UTMC, is exactly why the nurses should be expected to monitor and timely record and report any changes in the patient's condition. Stated another way, since the nurses could not necessarily be expected to recognize a heart attack in the making or in progress, they could be expected to closely monitor a patient and report any changes to the doctor. Further, the simple fact that the nurses would not have been able to recognize a heart attack in progress that resulted from allowing the patient to slip into a precarious condition would not relieve them or their employer from the obligation to provide the care that would have prevented the patient from reaching that precarious condition in the first place.

To summarize, we have considered the Hospital's various arguments, the more salient of which we have discussed and some of which we have not, as to why Dr. Ward's affidavit did not create a genuine issue of material fact. They do not convince us that Dr. Ward's affidavit can be ignored. Accordingly, we hold that the Plaintiff established genuine issues of material fact as to both causation and standard of care that preclude summary judgment. We must then hold that the trial court erred in granting summary judgment in favor of the Hospital.

D.

Before concluding, we recognize that both parties have submitted lengthy briefs that present arguments we have not discussed. For example, the Plaintiff asks us to hold that Nurse Ford was qualified to testify to the standard of care. The Hospital has not argued to the contrary. We have held that the Plaintiff presented genuine issues of material fact on both causation and standard of care. We need go no further. Similarly, we have not addressed arguments that would not, in our opinion, affect the outcome. For example, we do not think it advisable to decide whether the Plaintiff made a showing of excusable neglect for failing to timely file his materials in opposition to the motion for summary judgment since we have held that the materials were timely filed.

V.

The trial court's grant of summary judgment in favor of the Hospital is vacated. Costs on appeal are taxed to the appellee, Blount Memorial Hospital, Inc. This matter is remanded to the trial court, pursuant to applicable law, for further proceedings.

-25-

_____
CHARLES D. SUSANO, JR., JUDGE